## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **FELICITA DE NUNEZ,** | ) | **CASE NO. 1:11CV2285** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE JOHN R. ADAMS** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **Defendant.** | ) | **REPORT AND RECOMMENDATION** |

Plaintiff Felicita De Nunez ("Nunez") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Nunez's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381, *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be vacated and the case remanded.

### I. Procedural History

On January 29, 2008, Nunez filed an application for POD, DIB, and SSI alleging a disability onset date of August 14, 2006 and claiming that she was disabled due to back, shoulder, and wrist pain. (Tr. 106-112; 146.) Her application was denied both initially and upon reconsideration.

On April 5, 2010, an Administrative Law Judge ("ALJ") held a hearing during which

Nunez, represented by counsel, testified. Hershel Goren, M.D., an impartial medical expert ("ME"), and Ted S. Macy, an impartial vocational expert ("VE"), also testified.[1] On June 17, 2010, the ALJ found Nunez was able to perform past relevant work and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 49 at the time of her administrative hearing, Nunez is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). (Tr. 42.) Nunez has a fourth grade education and past relevant work as a laundry folder and cleaner. (Tr. 33, 50.)

### *Medical Evidence*

On March 30, 2006, Nunez injured her right wrist in a work accident. (Tr. 582, 625.) X-rays taken of the wrist in March and April, 2006 were unremarkable. (Tr. 242, 246.) X-rays taken in September, 2006 showed mild degenerative changes without acute osseous injury. (Tr. 502.) A magnetic resonance imaging ("MRI") scan also taken that month indicated tenosynovitis.[2] (Tr. 455-456.)

In November, 2006, Kim Stearns, M.D., performed surgery to treat DeQuervain's tenosynovitis. (Tr. 327, 454.) Nunez continued to see Dr. Stearns monthly between November 2006 and May 2007 as she recovered. (Tr. 257-262, 291.) On May 14, 2007, Dr. Stearns reported that Nunez was doing well with full motion of her hand and very little pain or swelling. (Tr. 291.) Dr. Stearns further indicated that Nunez was working on her strengthening through physical therapy, had reached maximum medical improvement, and could return to light work

---

[1] A Spanish interpreter was also present.

[2] The Commissioner contends that this report was conducted by a chiropractor. The Commissioner points to a second radiology report by a radiologist studying the same MRI, finding it to be "unremarkable." (Tr. 457.) Nunez, however, underwent surgery and the surgeon's operative findings indicate that Nunez had "significant tenosynovitis in the first dorsal compartment." (Tr. 454.)

2

that did not require repetitive movement in her right hand. *Id*.

On May 29, 2007, an independent medical evaluation for Nunez's workers' compensation claim was conducted by Ira J. Ungar, M.D., a certified independent medical evaluator. (Tr 278-283.) On physical examination, Nunez demonstrated almost zero range of motion in her right wrist. (Tr. 280.) On grip strength testing, Nunez generated little, if any force, with all of the musculature of the hand. (Tr. 281.) She "yelp[ed] to even light fingertip pressure at the distal radius." *Id*. Dr. Ungar noted that despite this testing, Nunez was able to hold a pen and sign the pre- and post-examination forms without difficulty. *Id*. He further reported that "[o]bjective evaluation 'allowed,' suggest[ed] near total fusion and paralysis of the right hand and wrist based on the examination Ms. Nunez [wa]s willing to demonstrate." *Id*. He concluded, however, that because Nunez's hand, wrist, and forearm showed no evidence of atrophy and appeared normal, there was substantial evidence of symptom magnification and misrepresentation. (Tr. 281-282.) He opined that Nunez was capable of returning to work at her previous level of employment without restrictions. (Tr. 282.)

On April 12, 2008, state agency physician Gerald Klyop, M.D., reviewed Nunez's medical records concluding that she retained the capacity for light work as she could occasionally lift and/or carry (including upward pulling) twenty pounds and frequently lift and/or carry ten pounds (including upward pulling) with unlimited pushing and/or pulling. (Tr. 541.) She could also stand and/or walk and sit for a total of about six hours in an eight-hour workday. *Id*. In addition, he found that the use of her right hand was limited to frequent (not constant) repetitive movements. (Tr. 543.) On August 1, 2008, Nick Albert, M.D., affirmed Dr. Klyop's opinion. (Tr. 560.)

From March, 2009 through December, 2009, Nunez treated with Ashok Patil, M.D., for the ongoing problems with her wrist. (Tr. 595-620.) Upon observing swelling and tenderness in her right hand and wrist at numerous examinations, tenosynovitis was diagnosed. (Tr. 599, 600, 602, 604, 607-608, 610-611, 612, 617, 619, 620.) Motrin 800 and Vicodin were prescribed and the doctor requested that she wear a wrist splint at night. (Tr. 599.) He also recommended physical therapy. *Id*. Dr. Patil further diagnosed lumbar-spine and left-shoulder impairments.

3

(Tr. 597.)

On October 20, 2009, Nunez treated with Sanjay R. Parikh, M.D., for seizures following an episodic spell where she lost consciousness. (Tr. 589-591.) During a neurological evaluation, Dr. Parikh reported that Nunez's fine finger and alternating movements were symmetrical. (Tr. 591.) He further reported that Nunez's strength was 5/5 with shoulder abduction, elbow flexion and extension, and equal grip. *Id*.

On the same day, Nunez was examined by Kutaiba Tabbaa, M.D., and Marisa Wynne, M.D.[3] The doctors noted that her "right hand was mildly swollen with mild atrophy of thenar eminence."[4] (Tr. 585.) Their notes indicated that strength testing was measured at 4, with a note of "active movement against resistance." *Id*. They diagnosed Nunez with contusion of the right wrist, right radial styloid tenosynovitis, other tenosynovitis of the right thumb/wrist, and contusion of the right hand. (Tr. 586-587.) Dr. Tabbaa was concerned about complex regional pain syndrome. (Tr. 586.) He prescribed medication and recommended aggressive physical therapy to begin after the pain calmed. *Id*. He further noted that Nunez is unable to work due to the injury to her dominant hand. *Id*.

### *Hearing Testimony*

At the hearing, Nunez testified to the following:

- The accident causing her injury occurred in February, 2006, but she continued to work until August 14, 2007, earning over $14,000. (Tr. 43-44.)

- She wears a brace on her right hand to help control the pain. (Tr. 43.)

- She also has pain in her left shoulder, hips and lower back, all the way down to her heel. (Tr. 43-44.)

- She stopped working because she could no longer tolerate the pain. (Tr. 44.)

- She described her average day as follows: After arising in the morning, she takes her pills and then does some cleaning in the house and tries to walk around. Occasionally, a neighbor will take her to a church meeting or she goes to an appointment. (Tr. 45.) Otherwise she is at home and is depressed because she

---

[3]The record indicates that Dr. Wynne was a resident doctor.

[4]"Thenar eminence" is defined as "the mound on the palm at the base of the thumb." *Dorland's Illustrated Medical Dictionary*, 30th ed., p. 1893 (2003).

> likes to work, but cannot. *Id*. She almost never watches television, except for the news. *Id*.

- She lives with her daughter on the first floor of the house, while her son lives on the second floor. (Tr. 46.)

The ME testified that Nunez's only severe impairment was major depressive disorder. (Tr. 47-48.) He did not believe that Nunez's impairments, either individually, or in combination, met or equaled any listing. (Tr. 49.) He suggested two work restrictions: no high production quotas and only superficial interpersonal interaction with supervisors, coworkers, and the general public. (Tr. 48.)

After the VE described Nunez's past relevant work as a laundry folder and cleaner to be an unskilled position, typically performed at a light to medium exertional level, the ALJ posed the following hypothetical:

> This person has the ability to lift/carry 50 pounds occasionally, 25 pounds frequently. No other exertional, postural, manipulative, visual, communicational or environmental deficits. This person should do low stress work, no high production quotas or piece rate work. No work involving arbitration, negotiation or confrontation, and only superficial interpersonal interactions with the public, coworkers and supervisors, and no responsibility for the health, safety and welfare of another party, and no supervision. That would be it.

(Tr. 54.) The VE testified that the hypothetical person would be able to perform Nunez's past work as a cleaner and folder.

The ALJ posed a second hypothetical as follows:

> Second hypothetical. This one's more detailed. Second person can lift/carry 20 pounds occasionally, 10 pounds frequently. * * * Can stand/walk six out of eight, sit six out of eight. No limit on climbing, including ladders, ropes or scaffolds. Constant balancing, stooping, kneeling and crouching, and occasional crawling. With regard to the manipulatives, reaching, handling, fingering and feeling are all frequent with the right hand, constant with the left. No visual or communications deficits, except that the hypothetical person speaks Spanish and has a limited command of English. No environmental limitations, low stress work. No high production quotas or piece rate work. No work involving arbitration, negotiation or confrontation. Superficial, interpersonal interactions with the public, coworkers and supervisors. No health, safety and welfare responsibility for another party, and no supervision, and that's it.

(Tr. 55.) The VE testified that this hypothetical person would not be able to perform Nunez's past work, but would be able to perform light, unskilled jobs, including bench assembler, wire worker, and electronics worker. (Tr. 55-56.)

5

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Nunez was insured on her alleged disability onset date, August 14, 2006, and remained insured through the date of the ALJ's decision, June 17, 2010. (Tr. 25.) Therefore, in order to be entitled to POD and DIB, Nunez must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

---

[5]The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found that Nunez engaged in substantial gainful activity from August 14, 2006, through August 14, 2007, and thus was not disabled during that time period. (Tr. 27.) However, he found Nunez had not engaged in substantial gainful activity on or after August 15, 2007. (Tr. 28.) The ALJ found Nunez established a medically determinable, severe impairment due to major depressive disorder; however, her impairment did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Nunez was found capable of performing her past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Nunez is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Nunez contends that substantial evidence does not support the ALJ's step two finding, credibility assessment, or the RFC. (Doc. No. 15 at 7-11.) She further contends that the ALJ improperly evaluated the opinions of her treating and reviewing physicians. (Doc. No. 15 at 10-11.) The Commissioner asserts that the ALJ relied on substantial evidence that indicated Nunez's right wrist was not significantly limited following surgery. (Doc. No. 16 at 9, citing 28-31.)

A severe impairment is defined by social security regulations as one which "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not merely by a claimant's statements. 20 C.F.R. §§ 404.1508, 416.908.

In the Sixth Circuit, a claimant's impairments are categorized as "severe" if there is merely a *de minimis* impact on her ability to perform basic work activities.[6] *See Halcomb v. Bowen*, No. 86–5493, 1987 WL 36064, at *3 (6th Cir. May 27, 1987); *Farris v. Sec'y of Health*

---

[6]The regulations describe a severe impairment in the negative: "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a).

8

*& Human Servs*., 773 F.2d 85, 89–90 (6th Cir. 1985); *Salmi v. Sec'y of Health & Human Servs*., 774 F.2d 685, 691–92 (6th Cir. 1985); Social Security Ruling 96–3P: Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe, 1996 WL 374181, at *1.

The ALJ is charged with a duty to evaluate all of the medical opinions in the record and resolve any conflicts that might appear. 20 C.F.R. §§ 404.1527 & 416.927. As such, the ALJ will give each opinion the weight deemed appropriate based upon factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether it is consistent with the entire record. 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2); SSR 96-2p. It is the responsibility of the ALJ alone, not a reviewing court, to weigh the medical evidence and resolve any conflicts that might appear. 20 C.F.R. § 416.927(d).

Furthermore, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]

---

[7] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the

9

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

However, "opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *See* SSR 96-5p, *5; 20 C.F.R. §§ 404.1527(e) & 416.927(e).

---

record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Opinions from agency medical sources are considered opinion evidence. 20 C.F.R. §§ 404.1527(f) & 416.927(f). The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii). More weight is generally placed on the opinions of examining medical sources than on those of non-examining medical sources. *See* 20 C.F.R. §§ 404.927(d)(1) & 416.927(d)(1). However, the opinions of non-examining state agency medical consultants can, under some circumstances, be given significant weight. *Hart v. Astrue*, 2009 WL 2485968, at *8 (S.D. Ohio Aug. 5, 2009). This occurs because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. Thus, the ALJ weighs the opinions of agency examining physicians and agency reviewing physicians under the same factors as treating physicians including weighing the supportability and consistency of the opinions, as well as the specialization of the physician. *See* 20 C.F.R. § 416.972(d), (f).

The Sixth Circuit, however, has held that the regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of some examining physicians' opinions over others. *See Kornecky*, 167 Fed. App'x at 508. The *Kornecky* Court found that:

> While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that:
>
> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.

*Id*.

The primary function of a ME is to explain complex medical terms and findings, thereby assisting the ALJ, who is not a medical professional. *Fullen v. Comm'r of Soc. Sec.*, 2010 WL

11

2789581, \*12 (S.D. Ohio Apr. 20, 2010 (*citing Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1972)).  An ALJ may "ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."  20 C.F.R. §§ 404.1527(f)(2)(iii) & 416.927(f)(2)(iii).  The ALJ must evaluate ME opinions under the same factors applicable to treating medical sources-including the doctor's medical specialty, his expertise in social security cases, the supporting evidence, and any explanations provided by the doctor.  *See* 20 C.F.R. §§ 404.1527(f) & 416.927(f).  Furthermore, unless the treating source's opinion is given controlling weight, the ALJ must explain the weight given to the opinions of a State Agency medical or psychological consultant.  *See* 20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii).

    Finally, the ALJ reserves the right to decide certain issues, such as a claimant's RFC.  20 C.F.R. §§ 404.1527(d) & 416.927(d).  Nevertheless, in assessing a claimant's RFC, an ALJ must consider all relevant evidence, including medical source opinions on the severity of a claimant's impairments.  *See* 20 C.F.R. §§ 404.1527(d), 1545(a) & 416.927(d), 945(a).  Furthermore, courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data.  *See Mabra v. Comm'r of Soc. Sec.*, 2012 WL 2319245, \*8 (S.D. Ohio Jun. 19, 2012); *Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at \*10 (S.D. Ohio Nov. 4, 2009) ("The residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'") (*quoting Deskin  v. Comm'r  Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at \*13 (N.D. Ill. Jan. 17, 2012) (remanding where an "ALJ created his own RFC based on his assumptions of what [the plaintiff] could do").

Here, the ALJ determined Nunez's right wrist impairment was non-severe, relying on the following evidence:

> Ms. Nunez injured her right wrist at work on March 31, 2006. Radiology reports of the wrist in March, April and September 2006 revealed no significant findings, however, in September 2006 mild degenerative changes were noted (Ex. 2F:10, 14; 7F:43). An MRI scan ultimately suggested first dorsal compartment tenosynovitis and she was also diagnosed with DeQuervain's Syndrome (Ex 3F:3,5; 6F:6-7). As conservative efforts had failed from March 2006 through October 2006, surgical intervention was recommended and Ms. Nunez was examined by Kim L. Stearns, M.D., orthopedic surgeon (Ex3F:5).
>
> Dr. Stearns performed a first dorsal compartment/deQuervain's release procedure on November 9, 2006 (Ex6F:5). By April 2007, Dr. Stearns' treatment notes report that Ms. Nunez had regained nearly full motion and reported being very pleased with Ms. Nunez progress (Ex 3F:11). In May 2007, Dr. Stearns discharged Ms. Nunez from her care and reported that Ms. Nunez was doing quite well with very little pain and swelling in her hand (Ex 5F:14). Dr. Stearns advised her to continue working on her strength with her chiropractor and released her to light duty capacity at that time (Ex 5F:14).
>
> Ms. Nunez, however, continued to treat with a chiropractor for her wrist (Ex 19F). In September 2007, Mark W. Clark, D.C. opined that Ms. Nunez work [sic] involves extensive use of her right wrist, which causes daily exacerbations of her condition (Ex 19F:4). However, as Ms. Nunez testified that she continued working in the same job until August 14, 2007, I give little weight to Dr. Clark's opinion. Furthermore, Ms. Nunez' continuation of her employment is a strong indication that her pain was not debilitating as she has alleged.
>
> In May 2007, Ms. Nunez was evaluated by Ira J. Ungar, M.S., M.D., FACEP, a certified independent medical evaluation (Ex 5F:1-6). Dr. Ungar examined Ms. Nunez as well as reviewed her treatment history. During his examination of Ms. Nunez, Dr. Ungar noted that she demonstrated almost zero range of motion of the wrist in flexion, extension, radial deviation and ulnar deviation (Ex 5F:3). There was no swelling noted, as well as no signs of atrophy (Ex 5F:4). Ms. Nunez attempted to grip strength test but did not activate the testing device with her right hand and light fingertip pressure at the distal radius elicited pained yelps from Ms. Nunez (Ex 5F:4). Dr. Ungar noted, however, that despite the noted inability to use her right wrist during the examination, Ms. Nunez held the pen to sign the pre and post examination forms without difficulty (Ex 5F:4). Dr. Ungar concluded that Ms. Nunez exhibited substantial symptom magnification and misrepresentation (Ex 5F:4).
>
> Ms. Nunez continued to seek treatment for her right wrist and continued to complain of severe symptoms to the chiropractor (Ex 20F). She also was examined by Ashok Patil, M.D. in 2009 as well (Exh 16F). However, as there have been no further objective findings to support Ms. Nunez' complaints [sic].
>
> Furthermore, after surgery Dr. Stearn [sic] reported almost full range of motion and significantly reduced pain. During the same month as Dr. Stearn's [sic] report, however, Ms. Nunez presented to Dr. Ungar and exhibited an almost immobile right hand. As the medical examinations differ significantly and as Dr. Ungar did not find any signs of atrophy, I find I must agree with Dr. Ungar's opinion regarding Ms. Nunez' magnification and misrepresentation of the severity

13

> of her symptoms. Finally, I note that during Ms. Nunez' doctor visits for other reasons, such as her back or shoulder pains, she does not mention her wrist pain and the physician notes do not indicate any perceived severe complications of the right wrist, as has been alleged by Ms. Nunez (*see* Ex 10F:6; 22F:31).

(Tr. 28-29.)

Nunez asserts that the ALJ ignored the opinions of her treating physician Dr. Patil, as well as the examining opinions of Dr. Wynne and Dr. Tabbaa. The Commissioner contends the Court must affirm the ALJ's decision if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even if there is also substantial evidence in the record that could support the opposite conclusion. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). (Doc. No. 16 at 10.) Further, the Commissioner asserts that the ALJ identified other clinical findings in the record to support his decision. *Id*. at 10-11.

Drs. Patil, Wynne and Tabbaa examined Nunez in 2009, all diagnosing tenosynovitis in the right wrist and hand after observing swelling and atrophy. Such observations are objective medical evidence as the regulations provide that "signs" include anatomical or physiological abnormalities observable by a physician. 20 C.F.R. §§ 404.1528(b) & 416.928(b). Moreover, Dr. Tabbaa opined that Nunez was unable to work due to the wrist injury. (Tr. 586.) The ALJ, however, ignored these opinions when determining Nunez' wrist problem to be non-severe. The regulations required the ALJ to evaluate all the evidence to determine the extent to which the opinion is supported by the record. *See* SSR 96-5p, *5; 20 C.F.R. §§ 404.1527(e) & 416.927(e).

Instead, the ALJ relied on Dr. Goren's testimony, as follows:

> At the hearing, Dr. Goren testified that Ms. Nunez' problems with her wrist, back and shoulder are not severe impairments. * * *Regarding Ms. Nunez' right wrist, Dr. Goren testified that although positive clinical findings were made in September 2006, the problem was successfully treated with surgery and properly healed.
>
> I give great weight to Dr. Goren's opinion as I find it to be consistent with the weight of the evidence.
>
> In sum, the medical record contains severe complaints from Ms. Nunez pertaining to her wrist, back and left shoulder. I find that, despite her continued complaints, the wrist was treated and subsequently healed. Ms. Nunez also continued to work the same job while complaining of the same impairments until August 2007, over 18 months. Furthermore, the medical treatment sought for these complaints is sporadic and very conservative. The most recent examination pertaining to a different impairment (anxiety attacks) revealed much different results than when

14

>Ms. Nunez was examined specifically for her wrist, back, or shoulder. I find Ms. Nunez to be not wholly credible regarding the severity of her impairments and find her conditions were not of the required severity to more than minimally affect her ability to perform basic work activities.
>
>However, despite the non-severe finding regarding the wrist, back, knee and shoulder, any limitations Ms. Nunez experiences as a result of these impairments have been incorporated into the residual functional capacity set forth in finding 6 below.

(Tr. 30-31.)

Nunez presented evidence from Drs. Patil, Wynne and Tabbaa that there was swelling and atrophy in the right wrist/hand. They diagnosed tenosynovitis. The ALJ was required to give reasons for rejecting Dr. Patil, a treating physician's opinion, especially when there were other supporting opinions of hand/wrist impairment. Normally, "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *McKenzie v. Comm'r*, No. 99–3400, 2000 WL 687680, at *5 (6th Cir. May 19, 2000) (*citing Foster v. Bowen*, 853 F.2d 488, 489 (6th Cir.1988)). The ALJ ignored Dr. Tabbaa's opinion that Nunez was unable to work.[8] The ALJ was required to address Dr. Tabbaa's opinion as it conflicted with the other evidence. Instead the ALJ concluded that Nunez's wrist/hand injury was not severe by relying on Dr. Goren's opinion that Nunez's wrist injury was treated and healed after surgery. The ALJ also relied on the workers compensation physician Dr. Ungar, who found no signs of atrophy and further opined that Nunez magnified and misrepresented the severity of her symptoms. Based upon these opinions, the ALJ concluded that Nunez's hand/wrist impairment was not severe.

"[A court] cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Because the ALJ did not provide an analysis that is

---

[8]The record reflects that Dr. Tabbaa examined Nunez one time and, therefore, is not a "treating" physician. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (one examination and a "physical capacity evaluation" by the doctor was not deserving of treating source review)

15

sufficiently specific, Nunez's argument that the ALJ failed to address Drs. Patil, Wynne, and Tabbaa's opinions is well-taken. The Court is unable to trace the path of the ALJ's reasoning.

The Commissioner argues that the error is harmless as the physicians' opinions support the conclusion that Nunez was not disabled. (Doc. No. 16 at 12-13.) In *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, the Court instructs that where the ALJ fails to give good reasons on the record for according less than controlling weight to treating sources, remand is necessary, unless the error is a harmless *de minimis* procedural violation. *Blakley*, 581 F.3d at 408-409; *Wilson*, 378 F.3d at 547. Such harmless error may include the instance where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the Commissioner "has met the goal of ... the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. However, the ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error where the court cannot engage in "meaningful review" of the ALJ's decision. *Id.* at 544.

In this case, the ALJ's lack of analysis of Drs. Patil, Wynne, and Tabbaa's opinions is not an excusable *de minimis* procedural violation. First, the Court cannot engage in meaningful review of the decision because the reasoning is not "sufficiently specific to make clear," Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5, that the ALJ recognized and evaluated the opinions of these doctors. Further, there is no evidence in the record that any of the recommendations of these physicians are "so patently deficient that the Commissioner could not possibly credit it." *Blakley*, 581 F.3d at 408-409; *Wilson*, 378 F.3d at 547. To the contrary, the findings of atrophy and swelling in 2009 is objective medical evidence. Lastly, even if the Court found substantial evidence supports the ALJ's weighing of Dr. Patil's opinion, substantial evidence alone does not qualify the non-compliance with 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2) as harmless error. *See Wilson*, 378 F.3d at 546 ("[T]o recognize substantial evidence as a defense to non-compliance with § 1527(d)(2)[ ] would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without

16

observance of procedure required by law.'" (*quoting* Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (2001))).

The *Wilson* Court cautioned that an agency's failure to follow its own regulations may cause "unjust discrimination," "deny adequate notice," and consequently "may result in a violation of an individual's constitutional right to due process." *Blakley*, 581 F.3d at 408-409 *(quoting Wilson*, 378 F.3d at 545 (*quoting Sameena, Inc., v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir.1998))). *Wilson* and *Blakley* are reminders that the Commissioner must follow his own procedural regulations in crediting medical opinions.

Nunez further contends that the ALJ miscalculated the RFC determination when he did not consider the limitations caused by her hand/wrist injury. Specifically, Nunez contends that the hypothetical question was not accurate because the ALJ did not include all the demands of "medium" work. (Doc. No. 17 at 7.) She asserts that the hypothetical did not include a restriction for standing or walking.[9] (Doc. No. 15 at 14.) The Commissioner responds that the ALJ adequately communicated to the VE that Nunez was limited to performing medium work by describing the terms used in the regulations. (Doc. No. 16 at 16-17.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

---

[9]Nunez also contends that the hypothetical should have mentioned the ability to push/pull fifty pounds occasionally and twenty-five pounds frequently. The Commissioner asserts that this restriction was implied by the reference to the ability to lift/carry, indicating the ability to perform medium work. (Doc. No. 16 at 16.) As the Court's recommendation is not based upon this argument, it will not be addressed.

17

However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

Two hypotheticals were presented to the VE. Regarding exertional limitations, the first one referenced a person having the ability to lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 54.) The second hypothetical included a person with the ability to lift/carry 20 pounds occasionally, 10 pounds frequently and can sit and stand/walk six out of eight hours. *Id*. This hypothetical also noted "[w]ith regard to manipulatives, reaching, handling, fingering and feeling are all frequent with the right hand, constant with the left." *Id*.

> The ALJ calculated Nunez's RFC as follows:
>
> After careful consideration of the entire record, I find that Ms. Nunez has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with certain restrictions. Specifically, Ms. Nunez is able to lift, carry, push and pull up to fifty pounds occasionally and 25 pounds frequently. She is able to perform low stress work with no high production quotas or piece rate work. She is able to perform tasks requiring only superficial interpersonal communications with her supervisors, coworkers and the general public. Ms. Nunez is precluded from tasks involving arbitration, negotiation, confrontation, supervising the work of others, or being responsible for the health, safety, or welfare of another.
>
> * * *
>
> Dr. Goren testified at the hearing that Ms. Nunez does in fact experience symptoms of major depressive disorder and he concluded that the depression is a severe impairment.
>
> I give great weight to Dr. Goren's opinion as he has had the opportunity to review all of the available evidence. Furthermore, I find Dr. Goren's opinion to be consistent with the weight of the evidence. Ms. Nunez has some difficulties due to her depression and that has been incorporated into the residual functional capacity. She also experiences some pain in her back, shoulder and right wrist, which limits the amount she is able to lift, carry, push and pull as set forth above. However, as previously discussed, I find Ms. Nunez to be less than credible regarding the severity of the pain and symptoms she experiences due to the inconsistent complaints and examination results noted by various examining physicians, as well as the fact that she continued to work in the same job for approximately 18 months after the alleged injury dates.

(Tr. 32-33.)

The ALJ found Nunez retained the ability to perform a full range of medium work.[10] "Medium work" is defined as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c) & 416.967(c). The Commissioner justifies the ALJ's decision because Nunez's past work was generally light, which was covered by the second hypothetical. The ALJ, however, did not mention the second hypothetical in the decision. The ALJ's reliance on the VE's testimony given in response to an incomplete hypothetical could be harmless error *if* the ALJ had sufficiently explained his RFC determination. However, the RFC analysis is incomplete as the ALJ did not consider Nunez's restriction in standing/walking or her limitation in handling and fingering. As such, the Court cannot determine whether the step four analysis is supported by substantial evidence.

Accordingly, a "sentence four" remand pursuant to 42 U.S.C. § 405(g) is appropriate to permit the Commissioner to clearly articulate justification for the RFC determination.[11] Having recommended remand on these issues, the Court need not consider Nunez's further arguments regarding whether the ALJ failed to evaluate a reviewing State Agency physician's opinion and whether the ALJ conducted an improper analysis at step four regarding a "generic" decision.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not

---

[10] Neither party, however, has pointed to any medical source limiting Nunez to medium work. The record contains a 2008 state reviewing physicians' physical RFC limiting Nunez to light work (Tr. 541, 560), but the ALJ did not mention it. The VE testified that Nunez's past work as a laundry folder and a cleaner were performed at light to medium exertional levels. Dr. Ungar, evaluating Nunez' workers' compensation claim, opined that she was capable of returning to work at her previous level of employment. (Tr. 282.) The only restrictions suggested by the ME were nonexertional due to her depression. (Tr. 47-53.) He did not offer a specific work limitation. *Id.*

[11] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

supported by substantial evidence. Accordingly, the decision of the Commissioner should be vacated and the case remanded, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White<br>United States Magistrate Judge

Date:  July 12, 2012

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.**  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).**  *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**